Opinion issued July 21, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00852-CR

———————————

Christopher Lee McKnight, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 56th District Court

Harris County, Texas



Trial Court Case No. 08CR2417

 



 

MEMORANDUM OPINION

                                                                                                      

A jury found Christopher Lee
McKnight guilty of the offense of felony murder.[1]  The jury found the allegation in the State’s
enhancement paragraph true and assessed punishment at confinement for
life.  On appeal, McKnight contends that
(1) the case should be abated for findings of fact and conclusions of law; (2)
the trial court erred in denying his motion to suppress because his custodial
statement was involuntary; and (3) the trial court diminished the State’s
burden of proof during voir dire.

We affirm.

Background

In July 2008, Karim Ubaldo met
McKnight and Kelly Gill at a motel room at the Red Carpet Inn in Houston for a
drug deal.  At some point a fight ensued
and McKnight and Gill taped Ubaldo to a chair, beat him, and injected him with
a lethal dose of heroin.  Ubaldo died as
a result of his injuries.  

Later that morning, Officer Bergen
received notice that a resident in Galveston had reported seeing an intoxicated
person at the end of her street.  When
Officer Bergen arrived on the scene around 5:45 a.m., he found McKnight rolling
around on the ground next to a Jeep wearing only boxer shorts.  McKnight’s shoes were scattered on the ground
and a pair of pants was hanging from one ankle. 
Officer Bergen recognized the Jeep as the one he had seen driving
through the neighborhood earlier that same morning.  McKnight was possibly intoxicated,
unresponsive, and had to be helped to his feet. 
When questioned, McKnight told Officer Bergen his name, but was unable
to tell him the date or where he was.  Officer
Bergen read McKnight his rights and arrested him for public intoxication and
driving while intoxicated.  

          Sergeant
Shannon arrived around 5:50 a.m. after Officer Bergen called for
assistance.  While conducting an
inventory of the Jeep, Sergeant Shannon leaned his head through the open front
driver’s side window and found the Jeep “smelled like a person had been dead
for a long time.”  Sergeant Shannon removed
a sheet on the back floorboard and found Ubaldo’s body.  McKnight’s fingerprints were found in various
places in and on the Jeep, including on the driver’s side door handle, the
steering wheel, and the driver’s side window. 


Officers placed McKnight in a
patrol car around 6:00 a.m.  They then
transported him to the police station around 7:45 a.m.  McKnight was placed in a holding cell until
he was removed for sobriety testing around 1:00 p.m.  The officer who administered the tests
determined that McKnight did not appear intoxicated, but did not include a
breathalyzer or blood test.

Sergeant Echols and Sergeant Putnam
began interviewing McKnight at around 3:40 p.m., approximately nine hours after
his arrest, and the interview lasted about four and a half hours.  The officers again read McKnight his rights
before beginning the interview, and McKnight signed a written waiver of those
rights.  McKnight was relatively quiet
during the first hour and a half of the interview.  He cooperated with the officers to the extent
that he answered questions, though Sergeant Putnam characterized his responses
as evasive.  He occasionally rubbed his
arms up and down, which Sergeant Echols believed was a reaction to drugs.  At one point, Sergeant Echols acted frustrated
with McKnight’s responses and walked out of the interview room as part of an
interrogation technique.  After this,
McKnight became more talkative.

McKnight was still in his boxers at
the start of the interview and for about 90 minutes before he was given clothing.  Sergeant Echols later testified that he
believed McKnight was wearing a swimsuit, which he stated was not uncommon for
people arrested in the Galveston area.  When
McKnight asked for clothes, Sergeants Echols and Putnam sent for clothing from
the jail because no clothes were immediately available at the interview
location.  The officers also provided
McKnight with food and breaks during the interview to use the restroom and
smoke.

McKnight eventually informed
Sergeant Echols that he had held Ubaldo at gunpoint, put tape over his mouth,
and that it “could have been” him who hit Ubaldo and broke his nose.  McKnight stated that he and his alleged
accomplice purchased the duct tape.  McKnight
also admitted that he purchased the heroin that was injected into Ubaldo.  McKnight also said that it “could have been”
him who assisted in the planning and that he participated in the “jacking,” or
robbing, of Ubaldo.  

McKnight never asked for an
attorney, though he asked for his mother and stated that he wanted to talk to
“somebody” several times.  Sergeant
Echols or Sergeant Putnam never promised anything in exchange for
cooperating.  Finally, McKnight did not
ask the officers to stop the interview at any point.  At one point in the interview, Sergeant Echols
asked, “Is this interview about to be over?” 
McKnight responded, “No.”  

The State indicted McKnight for
felony murder with the underlying felony of aggravated kidnapping. McKnight
filed a motion to suppress his custodial statement on the grounds that it was
involuntary.  McKnight maintained that
his statement was “not voluntary or was coerced or improperly induced or taken
under duress,” in violation of the Fifth Amendment.  McKnight asserted Sergeant Putnam improperly
induced his statement by stating that McKnight could help himself if he
cooperated because it would “look good . . . with the DA and Judge.”  Additionally, McKnight asserted that his
statement was involuntary because he was exhausted, deprived of clothes for an
extended period, and made the statement while intoxicated and under the
influence of drugs.  

          The
trial court held a hearing on the motion to suppress.  At the hearing, Officer Bergen testified that
when he encountered McKnight on the morning of his arrest, he appeared to be
intoxicated.  McKnight, however, passed a
sobriety test administered about seven hours after his arrest, before the
custodial interview began.  McKnight
appeared to have the normal use of his mental and physical faculties at that
time.  Sergeant Echols testified that
when he interviewed McKnight nine hours after his arrest, he was “very
responsive,” was able to carry on a conversation, and appeared to have “his
mental faculties about him.”  Both
Sergeant Echols and Sergeant Putnam testified that they believed it was
inappropriate to conduct the interview while McKnight was in his underwear and
that they obtained clothing as soon as possible from the jail.  McKnight testified that he did not tell the
officers everything he knew because he “didn’t want to get in trouble.”  McKnight never claimed that he was
embarrassed or uncomfortable due to his lack of outer garments or the
conditions of the interview.  

The trial court denied the motion
to suppress and found that McKnight made his statement voluntarily and without
coercion.  The trial court concluded
that, as a matter of law, McKnight did not make an unequivocal and unambiguous
invocation of right to counsel by asking for “help,” that he did not
unequivocally and unambiguously invoke his right remain silent, and that
Sergeant Putnam’s comment concerning the judge and the DA did not constitute
improper inducement.  

          During
voir dire, the trial judge described the State’s burden to prove felony murder
beyond a reasonable doubt as follows:

In other
words, the State of Texas has to prove . . . all of the elements of the case to
you.  And it never shifts.  That burden never jumps over to the
defendant.  It is always the state’s job to
prove up the case.  They have to prove
each and every element beyond a reasonable doubt.  There is no definition for beyond a
reasonable doubt.  You have to ask
yourself what you think a reasonable doubt is. 
And the state must prove it past or beyond a reasonable doubt.  

 

The judge went on to say that if the State proved its
case beyond a reasonable doubt the jurors must convict, but if the State failed
to satisfy its burden, then the jurors must find McKnight not guilty.  McKnight’s counsel did not object to the
trial court’s statements. 

          At
trial, a witness testified that she and Ubaldo went to the Red Carpet Inn in
Houston to meet McKnight and Gill concerning a drug deal.  McKnight was not there yet when they
arrived.  She testified that Ubaldo was
nervous because he did not have his gun, so they left and he returned later to
the same motel by himself.  The witness
also testified that in the eight years she had known Ubaldo, she had never
known him to use heroin.  

Sergeant Echols testified to the
circumstances surrounding McKnight’s custodial statement.  Sergeant Echols maintained that McKnight
“definitely” knew what he was saying and that he was fairly confident in the
truth of McKnight’s statement.  

Officer Cazares and several
forensics experts testified about the investigation.  They stated that they found McKnight’s fingerprints
and DNA throughout the Jeep and drug paraphernalia in the motel room.  They also testified that they found tape
residue on a wooden chair in the motel room and similar tape residue on
Ubaldo’s body.  The medical examiner
testified that tape residue near Ubaldo’s ear indicated the tape had been
placed over his mouth in addition to around his arms.  He also testified that Ubaldo had been struck
in the face before his death and suffered blunt force trauma to the brain.  The medical examiner found three injection
marks on Ubaldo, but no track marks indicating prior heroin use.  A blood analysis showed that the amount of
heroin in his system was a lethal amount. 
 

The jury found McKnight guilty of
felony murder.  At the punishment phase,
the jury found the allegation in the State’s enhancement paragraph true and
assessed punishment at confinement for life. 
McKnight timely filed this appeal. 

Findings of Fact and Conclusions of Law

          In his
first issue, McKnight contends that the case should be abated because the trial
court erred by failing to make written findings of fact and conclusions of law
regarding the voluntariness of his statement. 
If a question is raised about the voluntariness of a defendant’s
statement, the trial court must make an independent finding, outside the
presence of a jury, of whether the defendant gave the statement
voluntarily.  See Tex. Code Crim. Proc.
Ann. art. 38.22, § 6 (West 2005). 
“The court must enter an order stating its conclusion as to whether or
not the statement was voluntarily made, along with the specific finding of
facts upon which the conclusion was based . . .” Id.  We abated the case and
ordered the trial court to make findings of fact and conclusions of law
concerning the voluntariness of McKnight’s statement.  The trial court complied, and McKnight’s
first issue is rendered moot.  See Rocha
v. State, 16 S.W.3d 1, 10 (Tex. Crim. App. 2000).

          We
overrule McKnight’s first issue.

Motion to Suppress Custodial Statement

          In his
second issue, McKnight contends the trial court erred by denying the motion to
suppress his custodial statement because the statement was involuntary.  McKnight asserts his statement was
involuntary because (1) he was deprived of sleep and clothes, (2) Sergeant
Echols and Sergeant Putnam’s tactics improperly induced him to confess, and (3)
he was intoxicated or under the influence of drugs at the time of the
statement. 

A.      Voluntary Statement

A defendant’s recorded custodial
statement may be used as evidence against him if the defendant made it freely,
voluntarily, and without impermissible compulsion or persuasion.  See Tex.
Code Crim. Proc. Ann. art. 38.21 (West 2005).  A custodial statement is involuntary “if
there was official, coercive conduct of such a nature that any statement
obtained thereby was unlikely to have been the product of an essentially free
and unconstrained choice by its maker.”  State v. Terrazas, 4 S.W.3d 720, 723
(Tex. Crim. App. 1999) (quoting Alvarado
v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).  In other words, the ultimate question is
whether the defendant’s will was “overborne.” 
Creager v. State, 952 S.W.2d
852, 856 (Tex. Crim. App. 1997).  We
examine the totality of circumstances surrounding the confession to determine
whether a confession is voluntary.  Delao v. State, 235 S.W.3d 235, 239
(Tex. Crim. App. 2007); Wyatt v. State,
23 S.W.3d 18, 23 (Tex. Crim. App. 2000).

When a defendant moves to suppress
a statement on the ground of involuntariness, due process requires the trial
court to hold a hearing on the admissibility of the statement outside the
presence of the jury.  Alvarado, 912 S.W.2d at 211. 
At the hearing, the trial court is the fact finder and the sole judge of
the credibility and weight of the evidence. 
Maxwell v. State, 73 S.W.3d
278, 281 (Tex. Crim. App. 2002). 
Accordingly, the trial court is free to believe all or some of a
witness’s testimony.  State v. Ross, 32 S.W.3d 853, 855 (Tex.
Crim. App. 2000).

McKnight first asserts that law
enforcement officers deprived him of sleep and clothes, making his statement
involuntary.  He maintains was not given
a chance to sleep in the nine hours between his arrest and his questioning, the
majority of which appears to have been spent in a holding cell, and that a short
nap in a patrol car was insufficient.  Generally,
sleep deprivation must be deliberate and severe in order to rise to the level
of coercion.  See Contreras v. State, 312 S.W.3d 566, 575–76 (Tex. Crim. App.
2010) (holding no evidence police purposefully kept defendant awake and
defendant had opportunity to sleep); Foster
v. State, 101 S.W.3d 490, 497 (Tex. App.—Houston [1st Dist.] 2002, no pet.)
(noting that lack of sleep for as long as 16 hours does not alone render a
confession involuntary).  Cf. Oursbourn v. State, 259 S.W.3d 159,
170–71 (Tex. Crim. App. 2008) (listing circumstances that made statements
involuntary including interrogation for 18 hours while defendant was on
medication and deprived of food, further medication, or sleep).  While there was no evidence of whether
McKnight slept for an extended time between his arrest at 6:00 a.m. and his
interrogation at 3:40 p.m., his alleged sleep deprivation was not as a result
of the deliberate efforts by law enforcement or of such duration as to make his
statement involuntary.  See Oursbourn, 259 S.W.3d at 170–71; Foster, 101 S.W.3d at 497.

Further, the interviewing officers
provided McKnight with necessities like clothing, food, access to the restroom,
and a cigarette break.  While about 90
minutes passed before McKnight was provided with clothing, both interrogating
officers testified that they did not have immediate access to clothing at the interview
location.  Sergeant Echols also testified
that he believed McKnight was wearing a swimsuit, which was common for people
arrested in the Galveston area.  A delay
in providing a defendant with clothing, beyond underwear, does not necessarily
constitute coercive conduct.  See Birmingham v. State, No. 02-07-00048-CR,
2008 WL 2553393, at *4 (Tex. App.—Fort Worth June 26, 2008, pet. ref’d)
(holding confession voluntary when officers arrested defendant in his
apartment, interviewed him for some time in his underwear, then provided
clothes when defendant asked for them); Maxwell
v. State, No. 01-00-00708-CR, 2002 WL 356530, at *4 (Tex. App.—Houston [1st
Dist.] Mar. 7, 2002, pet. ref’d) (holding statements voluntary when officers
offered clothing to defendant along with food, drink, and a restroom break while
at crime scene).  The trial court as the
fact finder was entitled to consider the officers’ explanation for the delay in
giving McKnight clothing.  See Alvarado, 912 S.W.2d at 211.  Also, McKnight testified at the motion to
suppress hearing that his reluctance to speak to the officers was because he
“didn’t want to get in trouble,” rather than a result of his lack of
clothing.  

Second, McKnight asserts that
Sergeant Putnam’s comment that telling the truth would “look good to the Judge
and the DA” was extremely misleading and constituted coercion.  A defendant’s
statement may be found involuntary due to improper inducement or coercion if it
is improperly induced by a promise that was “(1) positive, (2) made or sanctioned
by someone in authority, and (3) of such an influential nature that it would
cause a defendant to speak untruthfully.” 
Henderson v. State, 962 S.W.2d
544, 564 (Tex. Crim. App. 1997).  General
statements concerning the benefits of telling the truth and how a confession
may result in more lenient treatment will not invalidate a confession.  See
Johnson v. State, 68 S.W.3d 644, 654–55 (Tex. Crim. App. 2002) (holding
officer’s statement that defendant’s honest cooperation would be communicated
to prosecutors and trial court was too ambiguous and general to render
confession involuntary); Walbey v. State,
926 S.W.2d 307, 312–13 (Tex. Crim. App. 1996) (holding officer’s statements
that in defendant’s best interest to cooperate too general to invalidate
confession); Kennon v. State, No.
01-07-00820-CR, 2008 WL 4530702, at *6 (Tex. App.—Houston [1st Dist.] Oct. 9,
2008, no pet.) (concluding that an officer’s statements to defendant urging him
to “tell the truth” and that he was trying to help defendant did not improperly
induce confession).  

Both Sergeant Echols and Sergeant
Putnam testified that they did not promise McKnight anything in exchange for
his cooperation.  In fact, McKnight
testified at the suppression hearing that Sergeant Putnam’s statement was not
the reason he decided to continue talking and that the only promise made by the
officers was “[t]hey just told me that if I told the truth, I would help myself
out.”  These general comments that McKnight
tell the truth are not sufficient to constitute police coercion.  See
Johnson, 68 S.W.3d at 654–55.[2]  

McKnight also never expressly
invoked his right to remain silent or requested that the interview stop, and
the trial court concluded that McKnight “never unequivocally and unambiguously
invoked his right to remain silent.”  Both
the United States Supreme Court and the Court of Criminal Appeals have
determined that a defendant must unambiguously invoke his right to remain
silent.  See Berghuis v. Thompkins, 130
S.Ct. 2250, 2259–60 (2010) (concluding that defendant did not invoke his right
to remain silent because he did not say that he wished to remain silent or that
he did not wish to speak with police); Dowthitt
v. State, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) (explaining that “an
officer need not stop his questioning unless the suspect’s invocation of rights
is unambiguous, and the officer is not required to clarify ambiguous
remarks.”). 

Finally, McKnight asserts that he
was intoxicated and incoherent at the time of his arrest and that he was
incapable of giving a voluntary statement when questioned later that same
day.  While relevant, evidence of
intoxication or the influence of drugs does not necessarily render a statement
involuntary.  Jones v. State, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).  “[T]he question becomes whether the
defendant’s intoxication rendered him incapable of making an independent,
informed decision to confess.”  Id. 

McKnight was incoherent at the time
of his arrest, but officers waited nine hours to interrogate him.  Witnesses testified that McKnight was
coherent and had sufficient use of his mental faculties by 1:00 p.m.[3]  Sergeants Echols and Putnam testified that
McKnight did not appear to be intoxicated or under the influence of any drugs
during their interrogation and that he answered questions and gave appropriate
responses.  

McKnight insists that drugs or any
other mind-altering substance would have a more lasting effect on his body and
mental capacity than alcohol.  Sergeant
Echols testified that he believed McKnight scratching and rubbing his arms was
a reaction to drugs, but he also observed that McKnight appeared to have his
mental faculties about him.  Despite some
evidence of earlier intoxication, a trial court is free to find a statement
voluntary based on evidence that the defendant is coherent and responsive
during the course of the interview.  See id. at 650 (holding that defendant’s
statement was not rendered involuntary when defendant testified he was drunk at
time of his arrest, but interrogating officers testified that he did not appear
intoxicated, had normal speech and mannerisms, and did not smell of alcohol at
time of his interview); Paolilla v. State, No. 14-08-00963-CR, 2011 WL 2042761, at *7–8 (Tex.
App.—Houston [14th Dist.] May 26, 2011, no pet. h.) (holding that defendant’s
statement was not involuntary due to drugs or withdrawal from heroin because
even if she was under influence of heroin she did not appear intoxicated, she
was oriented to her surroundings, her responses were “calculated,” and she was
“conscious and alert.”).  

The record demonstrates that
officers informed McKnight of his rights at his arrest and again nine hours
later, before the start of his interrogation, and that he signed a written
waiver of those rights.  Law enforcement
officers did not deprive him of basic necessities for an extended period of
time or promise him anything beyond that the State generally favored someone
who cooperated and told the truth.   The
trial court heard testimony that McKnight was coherent and responsive by the
time he made his statements.  Finally,
McKnight made no attempt to terminate the interview, continued to talk to the
officers, and made no attempt to ask for a lawyer or otherwise assert his
rights.  Based on the totality of the
circumstances, we conclude that the trial court did not err in denying McKnight’s
motion to suppress and finding McKnight made his statement voluntarily.

We overrule McKnight’s second
issue.  

Diminished Burden of Proof

          In
his final point of error, McKnight contends that the trial court improperly
diminished the State’s burden of proof by its description of the beyond a reasonable
doubt standard during voir dire. 
McKnight specifically cites the trial judge’s statement that, “There is
no definition for beyond a reasonable doubt. You have to ask yourself what you
think a reasonable doubt is.”  

          A.
     Preservation of Error 

As a general rule, to
preserve an error for appellate review, the complaining party is required to
make a timely request, objection, or motion. 
See Tex. R. App. P. 33.1(a)(1); Marshall v. State, 312 S.W.3d 741, 743 (Tex. App.—Houston [1st
Dist.] 2009, pet. ref’d).  Therefore, a
defendant must timely object to remarks by the State and the trial court during
voir dire.  See Marshall, 312 S.W.3d at 745; Espinosa v. State, 194 S.W.3d 703, 708 (Tex. App.—Houston [14th
Dist.] 2006, no pet.) (holding that appellant
failed to preserve the issue of improper argument by the prosecutor for
appellate review because he did not object when the prosecutor first made the
argument during voir dire). 
Without an objection the defendant waives the complaint on appeal unless
the alleged error was fundamental and affected substantial rights.  See Tex. R. App. P. 33.1(a)(1); see also Tex. R. Evid. 103(d). 

          B.
     Fundamental Error

McKnight failed to
object to the trial court’s comments on beyond a reasonable doubt during voir
dire.  We must, therefore, determine
whether the trial court committed fundamental error such that no objection was
required to preserve error.  McKnight
relies on the exception articulated in Blue
v. State when the trial court apologized to prospective jurors during voir
dire for the delay while the defendant considered a plea bargain and voiced a
preference that the defendants plead guilty. 
41 S.W.3d 129, 130 (Tex. Crim. App. 2000) (plurality op.).  The Court of Criminal Appeals held that the
comments “tainted appellant’s presumption of innocence” and were “fundamental
error of constitutional dimension and required no objection.”  Id.
at 132­–33.  

McKnight urges that
the trial court’s comments here regarding reasonable doubt similarly tainted McKnight’s
presumption of innocence.  We
disagree.  The comments in Blue conveyed the trial
court’s opinion that Blue was guilty, but the statement by the trial court here
did not convey any opinion as to McKnight’s guilt or innocence.  See id.
at 130, 132; Jasper v.
State, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).  This court has considered similar comments
made by prosecutors and judges during voir dire and found no harm to the
presumption of innocence and no fundamental error.  Marshall,
312 S.W.3d at 743–45 (holding that trial court’s statement that “Basically I
guess the Legislature figures everybody is reasonable and they would know a
reasonable doubt when they see it” was not fundamental error).  

McKnight alternatively relies on Wansing v. Hargett, a Tenth Circuit habeas corpus case, to support
his contention that the trial judge’s statement was fundamental error.  341 F.3d 1207, 1214 (10th Cir. 2003).  In Wansing,
the trial court’s comments regarding the meaning of reasonable doubt “implied that there [wa]s an extraordinarily broad range of possible
meanings, including some which are plainly unconstitutional, and informed the
jurors that they had to resolve the definitional issue for themselves, in the
‘individuality’ of their own ‘conscience and reason.’”  Id.  Under Texas law,
however, jurors must decide what proof beyond a reasonable doubt means to
them.  Murphy v. State, 112 S.W.3d 592, 597 (Tex. Crim. App. 2003); see Garret v. State, 851 S.W.2d 853,
859–60 (Tex. Crim. App. 1993) (explaining that “[A]n individual juror must
determine what proof beyond a reasonable doubt means to him, for the law does
not tell him.”).  The trial court’s
comments were therefore consistent with Texas law.[4]


We conclude the trial court’s comments on the State’s burden
of proof are not fundamental error and a timely and specific objection was
required to preserve the issue for appeal. 
Jasper, 61 S.W.3d at 421.  Because he failed to object, we hold that
McKnight has waived his complaint.  

We overrule McKnight’s third issue. 

Conclusion

          We affirm the judgment of
the trial court.  We deny all outstanding
motions as moot.  

 

 

                                                                   Harvey
Brown

                                                                   Justice


 

Panel
consists of Chief Justice Radack and Justices Sharp and Brown.

Do
not publish.   Tex. R. App. P. 47.2(b).











[1]           See
Tex. Penal Code Ann. §
19.02(b)(3) (West 2003).   





[2]           McKnight further asserts that the
“well-executed variation on the ‘Mutt and Jeff’ technique” contributed to the coercive effect of the
general statements and improperly influenced him to confess.  The “Mutt and Jeff” technique is most notably
described in Miranda v. Arizona, in
which one officer exhibits impatience and frustration with the defendant, while
the other appears sympathetic and helpful. 
384 U.S. 436, 452, 86 S. Ct. 1602, 1616 (1966).  The Court of Criminal Appeals, however, has
noted that a defendant’s eagerness to share information after one officer
stands up to leave the interrogation room is evidence of the defendant’s
voluntary confession.  See Joseph v. State, 309 S.W.3d 20, 26
(Tex. Crim. App. 2010).  McKnight
likewise became more talkative with this technique.  





[3]           McKnight passed a sobriety test
administered two hours before his interrogation.  While the administrator would not have been
able to determine if McKnight was under the influence of a substance other than
alcohol, he testified that McKnight had “the normal use of his mental and
physical faculties” at the time of the sobriety test. 





[4]           McKnight also asserts that the trial
court’s comments should be considered as a “structural” constitutional error,
requiring automatic reversal rather than a harm analysis because of the difficulty
in determining the effect of the error on a jury’s deliberations.  See
Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S. Ct. 1710 (1989).  McKnight, however, has not identified any
Texas cases adopting this analysis.